UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRANDON GREGORY ROBINSON, #352984,

                Petitioner,

v.                                    CASE NO. 07-15419
                                    HONORABLE DENISE PAGE HOOD

CAROL HOWES and
THE MICHIGAN PAROLE BOARD,

                Respondents.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, GRANTING A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner Brandon Gregory Robinson has filed an application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for resisting and obstructing police officers and two firearm offenses. Respondent Carol Howes urges the Court to deny the petition. The Court has determined that the state court's adjudication of Petitioner's claims was objectively reasonable. Accordingly, the habeas petition will be denied.

## I. BACKGROUND

### A. The State Court Proceedings

Petitioner was charged in Wayne County, Michigan with carrying a concealed weapon, resisting and obstructing a police officer, felon in possession of a firearm, and possession of a firearm during the commission of a felony. The charges arose from an incident that occurred in Highland Park, Michigan about 3:15 p.m. on September 28, 2004.

Petitioner waived his right to a jury trial and was tried before Wayne County Circuit Judge Leonard Townsend on February 2, 2005. The parties stipulated at trial that Petitioner was not eligible to carry a firearm on September 28, 2004, because he had previously been convicted of a felony and his rights had not been restored. The only trial witnesses were Wayne County Deputy Sheriffs Michael Kasholo and Phillip Kozlowski, who testified for the prosecution.

Deputy Kasholo testified that he was dispatched to 55 or 56 Elmhurst Street in Highland Park at about 3:15 p.m. on September 28, 2004. The nature of the run was "shots fired from a yellow vehicle." He parked his motorcycle and walked up to a yellow vehicle, which "stood out like a sore thumb" and matched the description sent out over the radio. Petitioner was seated in the vehicle. When he (Kasholo) got within ten feet of the car, Petitioner opened the driver's door, exited the car quickly, and repeatedly screamed, "I've done nothing wrong." Kasholo instructed Petitioner to stay put in the car. At the same time, Kasholo was looking in the car. He saw a handgun and notified the two officers who arrived shortly after him that there was a gun on the seat. By then, Petitioner was outside the car and walking alongside it. Kasholo thought that Petitioner was trying to walk away from him. He tried to close the gap between Petitioner and himself so that Petitioner could not get away before the officers determined what was happening. He approached the car with his weapon drawn due to the nature of the run, but he had put it away by the time Petitioner was outside the car.

Kasholo attempted to put his hand on Petitioner, but Petitioner quickly moved away from him. Deputy Sheriffs Phillip Kozlowski and Daniel Carmona then came to his aid. The two officers tackled Petitioner when he attempted to flee. A wrestling match ensued, but

the officers ultimately controlled Petitioner with the help of mace. After Petitioner was handcuffed and placed in a patrol car, Deputy Kasholo obtained the gun from the front seat of Petitioner's vehicle. The gun was fully loaded and ready to fire.

Kasholo subsequently encountered a woman in the vicinity who said that Petitioner had not done anything wrong, and a few people in the area reported that no shots had been fired. The trial court concluded from Kasholo's testimony that the gun had not been fired.

Wayne County Deputy Sheriff Phillip Kozlowski testified that he was dispatched to 55 Elmhurst Street pursuant to a 911 call regarding a possible drive-by shooting. He arrived in a fully marked scout car and observed Deputy Kasholo approaching a yellow vehicle. Petitioner was seated in the driver's seat, and he (Deputy Kozlowski) heard Deputy Kasholo tell Petitioner to stay in the car. Petitioner, however, exited the vehicle and kept saying, "I didn't do anything wrong." Kozlowski then attempted to grab Petitioner by the back of his collar and to turn him around to face his car. As he was doing that, Deputy Kasholo yelled, "Gun." Petitioner then swung around and tried to run toward the street. Kozlowski and his partner, Deputy Dan Carmona, pushed Petitioner to the ground. They struggled for three to five minutes and finally sprayed Petitioner with pepper mace. The struggle continued, and they sprayed Petitioner with mace a second time. He was ultimately subdued, and the weapon was secured.

Deputy Kozlowski stated on cross-examination by defense counsel that his weapon was drawn when he approached the yellow vehicle and that Sergeant Kasholo also had his weapon drawn. He claimed that there were no people on the street at the time, but he heard voices later on during the scuffle.

Petitioner did not testify or present any witnesses. His defense was that someone else placed the gun in his vehicle and then set him up by falsely reporting a shooting. He also maintained there was insufficient evidence that he knew the gun was in the car.

The trial judge found Petitioner guilty of resisting and obstructing a police officer, Mich. Comp. Laws § 750.81d(1), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. The trial judge sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent sentences of five months to five years for being a felon in possession of a firearm and five months to two years for resisting and obstructing a police officer. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion, but remanded the case so that the trial court could correct the judgment of sentence to reflect a sentence of five months to two years for felon in possession of a firearm and five months to five years for resisting and obstructing a police officer. *See People v. Johnson*,[1] No. 268413 (Mich. Ct. App. May 10, 2007) (unpublished). On September 10, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Johnson,* 480 Mich. 860; 737 N.W.2d 697 (2007) (table).

**B. The Federal Court Proceedings**

Petitioner filed a *pro se* habeas corpus petition in 2007, alleging four grounds for relief: two Fourth Amendment claims, one ineffective-assistance-of-counsel claim, and one prosecutorial-misconduct claim. Petitioner voluntarily dismissed his prosecutorial-

---

[1] Petitioner apparently is also known as Brandon Gregory Johnson.

misconduct claim when the State pointed out in a motion to dismiss the petition that Petitioner did not exhaust state remedies for the claim. *See* Docket Nos. 8-10 and 15, filed on July 3, 14, and 15, 2008, and March 23, 2009. The Court subsequently dismissed Petitioner's two Fourth Amendment claims pursuant to *Stone v. Powell*, 428 U.S. 465, 482, 96 S. Ct. 3037, 3046, 49 L. Ed. 2d 1067 (1976) (holding that "the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial" if the State provided the petitioner with an opportunity for "full and fair litigation" of the Fourth Amendment claim). *See* Docket No. 24, filed on March 24, 2010.

On May 11, 2010, the Court held an evidentiary hearing on Petitioner's remaining claim, which alleges ineffective assistance of trial counsel. Petitioner testified at the hearing that, on the day in question, he, his friend Lavelle, and his Uncle Paul were smoking "weed" in his car on Elmhurst Street in Highland Park. When they were finished smoking, Lavelle pulled a gun from his waistline and placed the gun under the front passenger seat of the car. Lavelle explained that he was going to run into the house for a moment and would be right back. Five to seven minutes later, several police cars arrived on the scene. The police officers informed Petitioner that they had received a call about gunshots being fired from a yellow car on that block. One of the officers grabbed him as he exited the vehicle. He resisted the arrest because he did not think he had done anything wrong and he did not know anything about a shooting.

Petitioner testified at the evidentiary hearing that he had told this same story to his trial attorney. He claimed, moreover, that the police lied at trial when they testified that: (1) he jumped out of his car and said, "I didn't do anything wrong;" (2) the gun was in plain

view; and (3) bystanders told them *after*, not before, the arrest that he did not do anything wrong. Petitioner also claimed at the evidentiary hearing that he knew the 911 call was a prank call because the gun did not belong to him and it was proven at trial that the gun had not been fired.

On cross-examination, Petitioner admitted that he had said three times at his sentencing that the gun belonged to him. He explained that his trial attorney had encouraged him to admit to owning the gun in order to get a favorable plea bargain in an unrelated case.

Petitioner's sister, Stacy Robinson, testified at the evidentiary hearing that she was seated on her grandmother's porch about three or four lots down from where Petitioner was parked on September 28, 2004. She saw several police cars drive down the street. The officers jumped out of their cars with guns and started asking people about a shooting. As soon as she heard the police say something about a shooting from a yellow cab, she knew they were referring to her brother because he was the only person in the neighborhood with a yellow taxi cab as a car. She ran to the area and observed the police pull Petitioner out of the car, tackle him to ground, and "mace" him as he said, "I didn't do anything."

Ms. Robinson claimed that there had been other people in the vicinity and that she never contacted Petitioner's trial attorney because Petitioner did not want her to get involved. He thought that she would not be viewed as credible due to the fact that she was his sister.

Petitioner's trial attorney testified at the hearing that Petitioner discussed the circumstances of his arrest with her and told her that he thought somebody had called the 911 emergency operator and lied about the incident. Petitioner had admitted to her that

he carried a gun to protect himself and that the gun was on the passenger seat of the vehicle when the police approached him. Petitioner never told her about people being in the car with him prior to the police arriving, and he never told her about any witnesses that would have been able to see a gun in the car.

Trial counsel further testified that she had listened to the 911 tape and concluded from the tape that the police had a reasonable suspicion to investigate the 911 call because the call was specific about the type and location of the vehicle involved in the incident. She decided not to file a motion to suppress because she did not think she had a viable basis for filing the motion. She thought that the gun had been in plain view, that Petitioner did not obey the officers' command, and that the police were justified in acting as they did.

Following the evidentiary hearing, the parties filed written closing arguments, and the Court permitted Petitioner to amend his petition to add the Michigan Parole Board as a respondent.[2] The case is now ready for adjudication.

## II. STANDARD OF REVIEW

Petitioner is entitled to habeas corpus relief only if the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[2] Petitioner has been released on parole and is being supervised by the Michigan Parole Board.

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed.2d 389 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*, 529 U.S. at 413, 120 S. Ct. at 1523. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*, 529 U.S. at 411, 120 S. Ct. at 1522.

## III. DISCUSSION

Petitioner alleges that his trial attorney was ineffective for failing to file a motion to suppress the gun seized by the police at the time of his arrest. The Michigan Court of Appeals rejected Petitioner's ineffective-assistance-of-counsel claim because it found no basis for concluding that Petitioner's Fourth Amendment rights were violated.

Although Petitioner's Fourth Amendment claim is not cognizable on habeas review pursuant to *Stone v. Powell,* Petitioner is not precluded from raising a Sixth Amendment claim based on counsel's alleged failure to litigate competently a Fourth Amendment claim. *Kimmelman v. Morrison*, 477 U.S. 365, 382-83, 106 S. Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient

performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). A deficient performance requires showing "that counsel's representation fell below an objective standard of reasonableness." *Id.*, 466 U.S. at 688, 104 S. Ct. at 2064. The prejudice prong requires showing "that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* 466 U.S. at 694, 104 S. Ct. at 2068.

The failure to file a motion to suppress evidence is not *per se* ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. at 384, 106 S. Ct. at 2587. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must . . . prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.,* 477 U.S. at 375, 106 S. Ct. at 2583.

### A. Whether the Police Lawfully Detained Petitioner

The first question is whether the police lawfully detained Petitioner. He alleges that the police detained him on the basis of an unreliable and uncorroborated anonymous telephone call. The Michigan Court of Appeals stated that the police were permitted to briefly detain Petitioner to investigate the situation because the totality of the circumstances were sufficient to support a reasonable suspicion that Petitioner may have been involved in a shooting.

### 1. Clearly Established Federal Law

The Fourth Amendment to the United States Constitution protects against

"unreasonable searches and seizures."  U.S. Const. amend. IV.  The Amendment's

protections "extend to brief investigatory stops of persons or vehicles that fall short of

traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151

L. Ed. 2d 740 (2002).  However, "a police officer may in appropriate circumstances and in

an appropriate manner approach a person for purposes of investigating possible criminal

behavior even though there is no probable cause to make an arrest."  *Terry v. Ohio*, 392

U.S. 1, 22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968).

> [A]n officer may conduct an investigatory stop only if he "has reasonable,
> articulable suspicion that the person has been, is, or is about to be engaged
> in criminal activity."  [*United States v. Place*, 462 U.S. 696, 702, 103 S. Ct.
> 2637, 77 L. Ed.2d 110 (1983)]; *see also* [*United States v. Smith*, 594 F.3d
> 530, 536 (6th Cir. 2010)].  Reasonable suspicion "must be based on specific,
> objective facts," *Brown v. Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed.
> 2d 357 (1979), and requires that "the detaining officers have a particularized
> and objective basis for suspecting the particular person stopped of criminal
> activity," *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66
> L. Ed. 2d 621 (1981).

*United States v. Johnson*, __ F.3d __, __, No. 09-5397, 2010 WL 3489004, at *5 (6th Cir.

Sept. 8, 2010).  It is not enough to have "an inchoate and unparticularized suspicion or

hunch," but "the level of suspicion required for a *Terry* stop is obviously less demanding

than for probable cause."  *Alabama v. White*, 496 U.S. 325, 329-30, 110 S. Ct. 2412, 2416,

110 L. Ed. 2d 301 (1990) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct.

1581, 1585, 104 L. Ed. 2d 1 (1989)).

> When discussing how reviewing courts should make reasonable-suspicion
> determinations, [the Supreme Court has] said repeatedly that they must look
> at the "totality of the circumstances" of each case to see whether the
> detaining officer has a "particularized and objective basis" for suspecting
> legal wrongdoing.  See, *e.g.*, [*United States v. Cortez*, 449 U.S. 411, 417-
> 418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)].  This process allows
> officers to draw on their own experience and specialized training to make
> inferences from and deductions about the cumulative information available

to them that "might well elude an untrained person." *Id.*, at 418, 101 S. Ct. 690. See also *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed.2d 911 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers)."

*United States v. Arvizu*, 534 U.S. at 273-74, 122 S. Ct. at 750-51. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.*, 534 U.S. at 277, 122 S. Ct. at 753.

A person is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty," *Terry*, 392 U.S. at 19 n. 16, 88 S. Ct. 1868, such that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L.Ed.2d 565 (1988) (internal quotation marks omitted). In addition, an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007); *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

*United States v. Johnson*, 2010 WL 3489004, at *3.

## 2. The 911 Tape and Dispatcher's Announcement

On the day in question, someone called the 911 emergency operator and stated that a black male in a yellow cab, which had been converted to a private automobile, had shot into a house at 56 Elmhurst Street. The transcript of the call[3] reads as follows:

2:44 p.m. Telephone ringing.

OPERATOR: 9-1-1, emergency.

CALLER: Is this the Highland Park Police?

OPERATOR: No sir, this is Detroit.

---

[3] Petitioner has prepared an unofficial transcript of the 911 call and the dispatcher's broadcast of the call to police officers. Because Respondent has not objected to the transcript, the Court accepts the transcript as accurate.

CALLER: OK.  There's a guy in a yellow cab car right here on Elmhurst[.  T]here's been a shootin' here just now.

OPERATOR:  OK.  He shot somebody?

CALLER:  No, he shot at a house just now.  I don'[t] know if a person got hit or not, I'm across the street at 59 . . .

OPERATOR: 59 what?

CALLER:  Elmhurst.

OPERATOR: What is they address?

CALLER:  He's in a yellow car outside the house.

OPERATOR:  What is the address of the house he shot into?

CALLER:  Ok.  I guess 56 Elmhurst.

OPERATOR:  Is he still there?

CALLER:  Yeah, he is.

OPERATOR: A yellow cab or yellow car?

CALLER:  It used to be a cab[;] he made it into his own car.

OPERATOR:  Is he black or white?

CALLER:  Black.

OPERATOR:  What is he wearing?

CALLER:  I don't know what he's wearing, man.

OPERATOR:  So he's driving a yellow car?

CALLER:  Yeah, he's out there now.

OPERATOR:  He just shot into this window?

CALLER: Yeah, into this house.

OPERATOR:  I'll request the police sir, thank you.

At 2:46 p.m., the dispatcher broadcast this announcement:

> DISPATCHER: County units in 16 we're getting 56 Elmhurst, has black male driving a yellow vehicle, he's firing shots into that address.  County units in 16 for 56 Elmhurst on a black male firing shots into that house.
>
> UNIT: County 570 (inaudible)
>
> DISPATCHER:  OK County 570 - I have you on the way – use caution there.
>
> UNIT:  What's the address?
>
> DISPATCHER:  56 Elmhurst.  56 Elmhurst.  Black male driving a yellow vehicle firing shots into that address.
>
> UNIT:  OK.
>
> DISPATCHER:  OK.

At 2:48 P.M., another unit responded to the broadcast as follows:

> UNIT: County Sam 1609.  Radio.
>
> DISPATCHER:  County Sam 609.
>
> UNIT:  I'm going to (garbled) as well.
>
> DISPATCHER: OK.

Petitioner is an African American man, and the police found him seated in a yellow vehicle where the caller said he could be found.  Thereby, the police corroborated the details of the 911 call.  Petitioner nevertheless claims that the person who called 911 and reported him to the police was anonymous and unreliable and, therefore, the information provided by the caller did not give rise to a reasonable suspicion.

### 3.  Informants and Anonymous Tipsters

In *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972), the

Supreme Court considered the case of a man found in illegal possession of a handgun during a "stop and frisk."  The Supreme Court found sufficient indicia of reliability to justify a forcible stop because the informant approached a police officer in person, was known to the officer, and had provided information to the police in the past.  The Supreme Court stated that Williams' case was "a stronger case than obtains in the case of an anonymous telephone tip.  The informant . . . came forward personally to give information that was immediately verifiable at the scene."  *Id.*, 407 U.S. at 146, 92 S. Ct. at 1923.

In *Alabama v. White*, 496 U.S. at 325, 110 S. Ct. at 2412, the Supreme Court considered the case of an anonymous telephone tip to the police.  The caller stated that a person would be leaving a certain apartment at a particular time and would be in possession of illegal drugs.  The Supreme Court held that the tip exhibited sufficient indicia of reliability to provide the police with reasonable suspicion to make an investigatory stop of the defendant's vehicle because the caller accurately predicted the defendant's future behavior.  This aspect of the call "demonstrated inside information – a special familiarity" with the defendant's affairs.  *Id.*, 496 U.S. at 332, 110 S. Ct. at 2417.

In *Florida v. J.L.,* 529 U.S. 266, 120 S. Ct. 1375, 146 L.Ed.2d 254  (2000), the Supreme Court held that an anonymous tip about a young black man wearing a plaid shirt and carrying a gun at a particular bus stop lacked sufficient indicia of reliability to establish reasonable suspicion to make a *Terry* stop.  The Supreme Court based its holding on the fact that the tip came from an unknown caller at an unknown location.  The police had no means to test the informant's knowledge or credibility because nothing was known about the tipster, and, unlike the situation in *White,* the tipster provided no predictive information to the police.  The Court stated that an accurate description of a suspect's readily

14

observable location and appearance was not enough to show that the tipster had knowledge of concealed criminal activity. The Court also declined to adopt an exception to the *Terry* standard for cases in which an accused is suspected of possessing a firearm. The Court conceded, however, that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.*, 529 U.S. at 270, 120 S.Ct. at 1378 (quoting *Alabama v. White*, 496 U.S. at 329, 110 S. Ct. at 2412).

### 4. Application

The person who reported Petitioner to the police did not give his name, and there is no indication in the record that he was known to the police or that he had provided reliable information in the past. However, the person did state that he was calling from 59 Elmhurst Street and that the man in the yellow "cab car" was across the street at 56 Elmhurst. The call, moreover, was recorded. These facts distinguish Petitioner's case from *Florida v. J.L.* where there was no audio recording of the tip and nothing was known about the informant.

Because the caller in Petitioner's case provided his address, he was readily identifiable; the police could have contacted him to verify the information he gave to the dispatcher.[4] A court may consider the fact that an informant places his anonymity at risk

---

[4] Police officers may rely on tips from fellow officers via a broadcast. *United States v. Graham*, 483 F.3d 431, 440 (6th Cir. 2007) (citing *United States v. Hensley,* 469 U.S. 221, 230-33, 105 S. Ct. 675, 83 L. Ed. 2d 306 (1971), and *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971)); *see also United States v. Drake*, 456 F.3d 771, 774 (7th Cir. 2006) ("When law enforcement officers are in communication with one another, the question whether they possess reasonable suspicion for a stop turns on their collective knowledge . . . .").

when weighing the reliability of a tip. *Id.*, 529 U.S. at 276, 120 S. Ct. at 1381 (Kennedy, J., concurring). In *Florida v. J.L.,* the police had a call from an unknown location. All they had to go on "was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.*, 529 U.S. at 271, 120 S. C. at 1379.

The Court concludes that the 911 caller in Petitioner's case was not entirely anonymous. The call "was made by a citizen-tipster, who was an eyewitness to the events []he reported to the police," and who provided his address to the police dispatcher. *United States v. Reed*, 1 F. App'x 706, 708 (9th Cir. 2001). The caller's tip bore indicia of reliability because he  summoned the police to his neighborhood and to a specific address across the street from where he was calling and apparently lived. He must have known that the police could contact him there and hold him responsible if he provided misinformation. *Cf. United States v. Savage*, 677 F. Supp. 2d 756, 762 & 762 n.2 (E.D. Pa. 2009); *see also United States v. Howard*, 150 F. App'x. 476, 479-80 (6th Cir. 2005) (distinguishing Howard's case from *Florida v. J.L.* because the unknown informant left his/her name and number with the 911 dispatcher). Based on the police officers' ability to contact the informant, "there was a higher level of trustworthiness in the present case than in those cases where the informant was purely anonymous." *United States v. Howard*, 150 F. App'x at 479-80.

 Furthermore, "[s]ome courts have concluded that an emergency 911 report is more reliable than an anonymous tip and may, by itself, supply reasonable suspicion to make an investigatory stop, at least when the caller identifies himself or herself." *United States v. Cohen*, 481 F.3d 896, 901 (6th Cir. 2007) (citing *United States v. Drake*, 456 F.3d at

774-75, and *United States v. Terry-Crespo*, 356 F.3d 1170, 1174-77 (9th Cir. 2004)).  As

explained in *McNeil v. City of Easton*, 694 F. Supp. 2d 375 (E.D. Pa. 2010):

> An anonymous 911 call reporting an ongoing emergency is entitled to "a
> higher degree of reliability and requires a lesser showing of corroboration
> than a tip that alleges general criminality."  *United States v. Simmons*, 560
> F.3d 98, 105 (2d Cir. 2009); *accord, e.g., United States v. Hicks*, 531 F.3d
> 555, 558-560 (7th Cir. 2008); *United States v. Elston*, 479 F.3d 314, 319 (4th
> Cir. 2007); *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir.
> 2004).  "Thus, when an emergency is reported by an anonymous caller, the
> need for immediate action may outweigh the need to verify the reliability of
> the caller." [*United States* v.] Holloway, [290 F.3d 1331, 1339 (11th Cir.
> 2002)].

*Id.* at 389.

In this case, there was an emergency call regarding a shooting across the street

from where the caller was located.  Even if the Court had some doubt as to the caller's

motives, "his explicit and detailed description of alleged wrongdoing, along with a statement

that the event was observed first-hand, entitles his tip to greater weight than might

otherwise be the case."  *Illinois v. Gates*, 462 U.S. 213, 234, 103 S. Ct. 2317, 2330, 76 L.

Ed.2d 527 (1983).  Although the evidence produced at trial indicated that no shooting

occurred,

> [t]he Fourth Amendment does not require a policeman who lacks the precise
> level of information necessary for probable cause to arrest to simply shrug
> his shoulders and allow a crime to occur or a criminal to escape.  On the
> contrary, *Terry* recognizes that it may be the essence of good police work to
> adopt an intermediate response.  *See* [*Terry*, 392 U.S.] at 23, 88 S. Ct., at
> 1881.  A brief stop of a suspicious individual, in order to determine his identity
> or to maintain the status quo momentarily while obtaining more information,
> may be most reasonable in light of the facts known to the officer at the time.
> *Id.*, at 21-22, 88 S. Ct., at 1879-1880; *see Gaines v. Craven*, 448 F.2d 1236
> (CA9 1971); *United States v. Unverzagt*, 424 F.2d 396 (CA8 1970).

*Adams v. Williams,* 407 U.S. at 145-46, 92 S. Ct. at 1923.

Furthermore, the gun in Petitioner's car was visible to Deputy Kasholo as he

advanced toward Petitioner. Petitioner had not been "seized" within the meaning of the Fourth Amendment at that point in time because he had not yet yielded to the show of authority. The gun provided an additional basis for suspecting that a crime had been committed, was being committed, or was about to be committed.[5]

There also was evidence of evasive conduct. Even before Deputy Kasholo had a chance to speak with Petitioner, Petitioner quickly got out of his car and said that he had not done anything wrong. Deputy Kasholo concluded from past experience that people who behave in such a way do so for a reason. (Tr. Feb. 2, 2005, at 12.) Deputy Kasholo tried to close the gap between himself and Petitioner because he feared that Petitioner would leave before the police could determine what had happened. *Id.* at 13. Nervous and evasive behavior, appearing to want to run, hurrying away from the police, and defiant conduct are factors that may be considered in determining whether reasonable suspicion existed for an investigatory stop. *United States v. Smith*, 594 F.3d 530, 540 (6th Cir. 2010); *United States v. Jones*, 562 F.3d 768, 776 (6th Cir. 2009); *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

---

[5] The Court finds Petitioner's testimony that the gun was not in plain view to be incredible because he has offered three different explanations for the gun. At trial, his defense was that he did not know whose gun it was or who put the gun in his car; at sentencing, he admitted that the gun belonged to him; and at the evidentiary hearing in this Court, he claimed that the gun belonged to a friend, who hid the gun under the seat of the car. Petitioner subsequently contradicted himself at the evidentiary hearing by insinuating once again that the unknown 911 caller might have left the gun in his car. (Tr. May 11, 2010, at 23.) Petitioner's trial attorney testified at the hearing that Petitioner had admitted to her that the gun was on the seat of the car when the police approached him. This testimony was consistent with the Deputy Kasholo's testimony that the gun was in plain view on the car seat.

The Court concludes from the totality of the circumstances that the 911 caller's tip had indicia of reliability and provided the police with reasonable suspicion to detain Petitioner and to investigate the situation. In reaching this conclusion, the Court acknowledges "the importance of allowing police officers to draw reasonable inferences from their observations in light of their specialized training and experience." *United States v. Jones*, 562 F.3d at 776 (citing *United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008), and *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)).

### B. Petitioner's Arrest and Seizure of the Gun

The remaining question is whether the police had probable cause to arrest Petitioner and seize the gun in his car.

### 1. Clearly Established Federal Law

Whether probable cause to arrest exists depends on "whether, at the moment the arrest was made . . . the facts and circumstances within (the officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964) (citing *Brinegar v. United States*, 338 U.S. 160, 175-176, 69 S. Ct. 1302, 1310-1311, 93 L.Ed. 1879 (1949), and *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171, 4 L.Ed.2d 134 (1959)). "[U]nder certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S. Ct. 2022, 2037, 29 L.Ed. 2d 564 (1971). "[T]he 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." *Id.*, 403 U.S. at 466, 91 S. Ct. at 2038 (citing *Harris v. United*

*States*, 390 U.S. 234, 88 S. Ct. 992, 19 L. Ed. 2d 1067 (1968); *Frazier v. Cupp*, 394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); and *Ker v. California*, 374 U.S. 23, 43; 83 S. Ct. 1623, 1635, 10 L. Ed. 2d 726 (1963)). The item must not only be in plain view, but "its incriminating character must also be 'immediately apparent,'" and the officer must not only "be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136-137, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d 112 (1990) (citations omitted).

### 2. Application

Deputy Kasholo testified at trial that he observed a gun in Petitioner's car as he approached the car. He had a lawful right to be there, and the gun was plainly visible to him. The gun's incriminating character was immediately apparent, considering the fact that Kasholo had been told about a man shooting from a yellow car. Therefore, the seizure of the gun was authorized by the "plain-view" doctrine.

The gun and Petitioner's crime of resisting and obstructing the police officers provided probable cause to arrest him. *See United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996) (stating that "[a] police officer is permitted to make an arrest without a warrant for a misdemeanor committed in his presence") (citing *United States v. Watson*, 423 U.S. 411, 418, 96 S. Ct. 820, 825, 46 L.Ed.2d 598 (1976)); *People v. Green,* 260 Mich. App. 392, 398; 677 N.W.2d 363, 369 (2004) (concluding that the police had probable cause to arrest the defendant after they attempted to restrain him for safety reasons, because he committed a misdemeanor in their presence by resisting and obstructed the officers), *overruled on other grounds by People v. Anstey*, 476 Mich. 436; 719 N.W.2d 579 (2006). Petitioner's arrest and the seizure of the gun from his car were proper.          **3** **.**

**Summary**

The Court concludes that Petitioner lacked a meritorious Fourth Amendment claim. The police had a legitimate basis for detaining and arresting Petitioner and for seizing the gun in his car. Therefore, Petitioner's trial attorney was not ineffective for failing to file a motion to suppress evidence, and the state court's rejection of Petitioner's ineffective-assistance-of-counsel claim was objectively reasonable.

### C. Failure to Request an Evidentiary Hearing

Petitioner also alleges that his trial attorney was ineffective for failing to request an evidentiary hearing and failing to admit in evidence a recording of the 911 emergency call to the police. The Court understands Petitioner to be alleging that the recording would have been exculpatory evidence that the anonymous caller provided false information about gunshots being fired from Petitioner's vehicle. Petitioner claims that the false information led to a search of his vehicle and the discovery of the gun in the vehicle.

The trial court in all likelihood would not have viewed the recording as exculpatory evidence, because the caller implicated Petitioner in criminal activity, and the police officers corroborated some of the details provided by the caller, including the fact that Petitioner had possession of a gun. Furthermore, Petitioner was not charged with actually firing the gun, and the trial court was made aware that no gunshots were fired. (Tr. Feb. 2, 2005, at 21-22.) The trial court concluded from mention of the radio run that the police officers had a reason for doing what they did and that they had a right to be there. (*Id.* at 39.) This Court concludes that defense counsel's failure to request an evidentiary hearing or to move to admit the 911 tape did not fall below an objective standard of reasonableness and did not prejudice the defense.

## IV. CONCLUSION

The state appellate court's decision in this case was not contrary to federal law as determined by the Supreme Court, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [Docket No. 1, filed December 20, 2007] is **DENIED**.

Reasonable jurists, however, could disagree with the Court's resolution of Petitioner's constitutional claims or conclude that the issues presented deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034, 154 L.Ed.2d 931 (2003).

Accordingly, it is further **ORDERED** that a certificate of appealability is **GRANTED**. Petitioner may proceed *in forma pauperis* on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: November 30, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 30, 2010, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager